**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**BRANDON RANDALL,**

       **Plaintiff,**

  **v.**

**ETHICON, INC. and**
**MEDICAL DEVICE BUSINESS**
**SERVICES, INC.,**

       **Defendants.**

**CIVIL ACTION**

**NO.: _____**


**VERIFIED COMPLAINT FOR DECLARATORY RELIEF**

**Introduction**

1.    This suit seeks a declaration concerning the enforceability of a non-competition agreement entered into by and between Plaintiff, Brandon Randall, a Massachusetts resident, and Defendant Medical Device Business Services, Inc. (f/k/a DePuy Orthopaedics, Inc.) ("DePuy"). DePuy and Defendant Ethicon, Inc. ("Ethicon") are attempting to use The Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (the "Non-Competition Agreement") at issue to restrict Randall from using his education, skills and knowledge to commence his employment as Head of Robotics with Smith & Nephew.[1]  More specifically, Defendants contend that the Non-Competition Agreement excludes Randall from accepting certain positions for any company that competes with any one of the more than 250 separately and independently operated legal entities within the Johnson & Johnson Family of Companies for a

---

[1] A copy of the Non-Competition Agreement is attached hereto as **Exhibit A.**

period of eighteen (18) months after the termination of his employment DePuy.  As detailed below, the Non-Competition Agreement is void and unenforceable under Massachusetts law and public policy because it is broader than necessary to protect Defendants' business interest; it extends beyond 12 months; and has an unreasonable geographic scope.

2.      Randall, who currently is, and at all times material hereto, was a Massachusetts resident when he was required to execute the Non-Competition Agreement; was employed by DePuy in Raynham, Massachusetts for the entirety of his employment with DePuy and Ethicon; and performed the majority of his work in Massachusetts.

3.      Inexplicably, despite no sustainable basis for doing so, DePuy has sued Randall in the State of New Jersey for allegedly violating the Non-Competition Agreement (the "New Jersey Lawsuit").[2]

4.      Ethicon is also a named plaintiff in the New Jersey Lawsuit – but it is not a named party to the Non-Competition Agreement, is a separate and distinct legal entity from DePuy, and didn't require Randall to execute a new non-compete agreement when he joined Ethicon in October 2019.  Significantly, under governing Massachusetts law, Randall's move to Ethicon from DePuy constituted a substantial and material change to his employment.  Accordingly, Ethicon was required to enter into a new non-compete agreement with Randall when their employment relationship commenced in October 2019.  Ethicon and Randall never entered into that agreement.

5.      Randall initiated this declaratory judgment proceeding in order to protect his right to use his education, skills and knowledge to secure employment.  To that end, Randall requests that the Court declare the Non-Competition Agreement is unenforceable because [i] the length of the non-compete period is longer than twelve (12) months; [ii] it is broader than reasonably

---

[2] A copy of the Complaint filed in the New Jersey Lawsuit is attached hereto as **Exhibit B**.

necessary to protect any legitimate interests of DePuy; [iii] the geographic scope of the Agreement is unreasonable; and [iv] there was a significant and material change in Randall's employment in October 2019 – Randall's employment with DePuy ended in October 2019 following a reduction in force by DePuy, and Randall did not execute a new non-competition agreement when he on-boarded with Ethicon in October 2019.

## Parties

6.      Plaintiff Brandon Randall is a Massachusetts resident citizen residing at 187 Tobey Garden Street, Duxbury, Massachusetts 02332.

7.      Defendant Ethicon, Inc. ("Ethicon") is a New Jersey corporation with its principal place of business in West Somerville, New Jersey. Ethicon is licensed to do business in the state of Massachusetts and may be served with process on its registered agent, C T Corporation System, at 155 Federal Street, Suite 700, Boston, MA 02110.

8.      Defendant Medical Device Business Services, Inc. (f/k/a DePuy Orthopaedics, Inc.) ("DePuy") is an Indiana corporation with its principal place of business in Warsaw, Indiana. DePuy is licensed to do business in the state of Massachusetts and may be served with process on its registered agent, C T Corporation System, at 155 Federal Street, Suite 700, Boston, MA 02110.

## Factual Allegations

### Randall's Employment with DePuy

9.      Randall began his working career with Synthes Inc. in 2003.  Synthes was acquired by DePuy in approximately 2012.  In 2012 Randall was offered a position with DePuy Synthes, one of the more than 250 separate and independent legal entities that make-up the Johnson & Johnson Family of Companies.  Randall ultimately accepted the position.

10.     In June 2017, DePuy offered Randall the position of Senior Director, Research and Development Strategy and Business Operations for orthopedics at DePuy Orthopaedics, Inc., which Randall accepted.  Randall executed the Non-Competition Agreement in connection with that position in 2017 and worked with DePuy in Massachusetts from 2017 until October 2019.

11.     Despite the plain language of the Non-Competition Agreement and the fact that DePuy was his employer, in the New Jersey Lawsuit Defendants are contending that Randall essentially contracted with all of the more than 250 separate and distinct legal entities that comprise the Johnson & Johnson Family of Companies. But a cursory examination of the Agreement reveals that the only parties to the Non-Competition Agreement are Randall and DePuy.  Accordingly, as Randall's new employment relationship with Ethicon constituted a substantial and material change to the terms of his employment with DePuy, a new restrictive covenant had to be entered into with Ethicon.

**Randall's Substantial and Material Change to Terms of Employment**

12.     In mid-2019, following certain workforce reduction measures by DePuy, Randall's role with DePuy became both undefined and unstable.  Despite everyone's best efforts to find a job for him with DePuy, Randall's employment with DePuy ultimately came to an end in October 2019.

13.     Fortunately for Randall, the job market was robust and numerous other companies were looking to onboard persons with his skill-set in Massachusetts.  Ethicon, Inc. – a Johnson & Johnson company that is separate and distinct from DePuy - was one of those companies.

14.     Randall ultimately joined Ethicon as its Senior Director, Integration Programs, Robotics and Digital Solutions in October 2019.

15.     The fact that Randall could remain a Duxbury, Massachusetts resident and continue working in Massachusetts played a key role in his decision to join Ethicon.  Although the job with Ethicon was a significant and material change for Randall, Ethicon did not require him to execute a new non-compete agreement as a condition of his employment.

16.     After spending a year or so with Ethicon, Randall concluded that he would be better served by seeking employment somewhere other than Ethicon.  Accordingly, on August 31, 2020 Randall announced his resignation from Ethicon.

17.     Randall was offered the position of Head of Robotics for Smith & Nephew, Inc.; a position that he has accepted but has been prevented from actually starting in due to Defendants' intentional and improper interference.

### *Defendants Seek to Improperly Enforce the Non-Competition Agreement*

18.     On September 29, 2020, Defendants filed the New Jersey Lawsuit seeking, among other things, injunctive relief prohibiting Randall from accepting the Head of Robotics position with Smith & Nephew.  However, the appropriate place for the dispute between Randall and Defendants is Massachusetts - where Randall resides and previously worked for Defendants.

19.     As Randall is a Duxbury, Massachusetts resident that is being wrongfully deprived of the opportunity to use his education, skill and knowledge to commence employment, an actual case or controversy exists as to the enforceability of the Non-Competition Agreement, which can be resolved by a declaration from this Court declaring that the Non-Competition Agreement is invalid and unenforceable, and that Ethicon and Randall never entered into a non-compete agreement as a matter of law.

**COUNT ONE**

**(DECLARATORY JUDGMENT)**

20.     Randall incorporates by reference paragraphs 1 through 19 as if fully set forth herein.

21.     Randall seeks a declaratory judgment declaring that the Non-Competition Agreement is void and enforceable because [i] the length of the non-compete period is longer than twelve (12) months; [ii] the Agreement is broader than reasonably necessary to protect any legitimate interests of DePuy; [iii] the geographic scope of the Agreement is unreasonable; and [iv] there was a significant and material change in Randall's employment in October 2019 – Randall's position with DePuy ended in October 2019 following a reduction in force by DePuy, and Randall did not execute a new non-competition agreement when he on-boarded with Ethicon in October 2019.

22.     Governing Massachusetts law and public policy mandates that the Non-Competition Agreement be declared void and unenforceable because:

[i]     Randall did not execute a new non-compete agreement when he joined Ethicon;

[ii]    The Non-Competition Agreement extends for eighteen (18) months, which clearly is longer than one year and unreasonable;

[iii]   The geographic scope of the Non-Competition Agreement is vague and overbroad because it defines the geographic scope as "any geographic location in which you could disadvantage the COMPANY or advantage the COMPETITOR"; and

[iv]    The Non-Competition Agreement is not reasonable in the scope of prohibited activities as it states that Randall "will not directly or indirectly perform, or assist others to perform, work for a COMPETITOR in a position . . . in which you could disadvantage the COMPANY or advantage the COMPETITOR."

23.     Based on the foregoing, Randall, pursuant to Mass. Gen. Laws Ch.149 §24L and Mass. R. Civ. P. 57, is entitled to a declaratory judgment declaring that the Non-Competition

6

Agreement is not enforceable, binding, or valid and that Randall is permitted to accept the position of Head of Robotics for Smith & Nephew.

## COUNT TWO

## (TORTIOUS INTERFERENCE)

24.    Plaintiff incorporates and re-alleges the foregoing paragraphs as if set forth verbatim herein.

25.    A current business relationship existed between Randall and Smith & Nephew, a third party, arising from Randall's acceptance of the Head of Robotics position at Smith & Nephew.

26.    Defendants DePuy and Ethicon were aware that Randall had accepted the Head of Robotics position at Smith & Nephew, and therefore were aware of the business relationship that existed between Randall and Smith & Nephew.

27.    Defendants DePuy and Ethicon intentionally and improperly interfered with the business relationship that existed between Randall and Smith & Nephew by seeking to improperly enforce an invalid and unenforceable Non-Competition Agreement.

28.    Defendants DePuy's and Ethicon's intentional and improper actions have caused an impairment of the business relationship that existed between Randall and Smith & Nephew by preventing Randall from beginning work for Smith & Nephew in the Head of Robotics position, to Randall's detriment, including, but not limited to, loss salary, benefits and other monetary losses.

**WHEREFORE,** Plaintiff Brandon Randall respectfully prays as follows:

1.    That the Court issue a declaratory judgment declaring that the Non-Competition Agreement is invalid and unenforceable;

2.      For an award of Randall's reasonable attorneys' fees;

3.      For compensatory damages sufficient to compensate Randall for the salary, benefits and other monetary losses that Randall has suffered as a result of Defendants' actions related to the Non-Competition Agreement, the value of which exceeds $100,000.00;

4.      The costs of this action;

5.      For a trial by jury on all issues so triable; and

6.      For such other and further relief as the Court deems just and proper.

Respectfully submitted,

BRANDON RANDALL,
By his attorneys,

*/s/ Christopher A. Callanan*
Christopher A. Callanan MA (BBO# 630649)
Callanan Law LLP
177 Huntington Avenue Suite 1703
PMB 70409
Boston, MA 02115-3153
Direct: 617-330-7575
Fax: 857-241-3037
Email: ccallanan@callanan-law.com

-and-

Clarence A. Wilbon (TN BAR No. 23378)
(*pro hac vice forthcoming*)
Adams and Reese LLP
6075 Poplar Ave. Suite 700
Memphis, TN  38119
Phone: 901-524-5324
Fax: 901-524-5424
Email:  clarence.wilbon@arlaw.com

## Declaration Pursuant to 28 U.S.C. § 1746

I declare under penalty of perjury that the information set forth in foregoing Verified Complaint is true and correct to the best of my knowledge.

Executed on October 16, 2020.

Brandon Randall

# **EXHIBIT A**

## EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

Name of Employee: <u>Brandon Randall</u>

Employee WWID: <u>418091</u>

**Depuy Orthopaedics. Inc.** (the "EMPLOYER") is one of numerous entities within the Johnson & Johnson Family of Companies (individually and/or collectively, the "COMPANY"). The businesses in which the COMPANY is engaged are extremely competitive. Your role involves a position of trust and confidence in which you will have access to confidential, proprietary, and secret information, the disclosure of which would cause the COMPANY to suffer substantial and irreparable harm. In your role, your activities will, directly or indirectly, support the COMPANY's business, research and development efforts, business and customer relationships, reputation and goodwill, all of which are valuable interests, which if used or diverted to benefit a competitor, would result in irreparable harm.

To protect these interests and for good and valuable consideration including, without limitation, your employment in a position of trust and confidence, your compensation and benefits, your access to confidential, proprietary, and secret information, and the opportunity to develop, maintain and enhance business and customer relationships, this Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (the "AGREEMENT") establishes certain obligations during and after your employment. This AGREEMENT applies to your current position and any position of trust and confidence you may hold (whether by promotion, transfer or assignment) within the COMPANY.

## 1.    Disclosure and Assignment of Inventions and Works

1.1    For purposes of this AGREEMENT, "INVENTIONS" means (a) discoveries, improvements, ideas, concepts, research, data, reports, plans, systems, technology, products, methods, and processes, whether or not patentable, and (b) trademarks, service marks, trade dress, design marks, design rights, logos, domain names, handles, user names, and trade names, whether or not registered.

1.2    You will disclose promptly in writing to your EMPLOYER or its designee all INVENTIONS conceived, created and/or reduced to practice by you during your employment whether or not during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, either solely or jointly with another or with others, and related to the actual or anticipated business or activities of your EMPLOYER or any COMPANY, or related to their actual or anticipated research and development or suggested by or resulting from any task assigned by you or work performed by you for, or on behalf of, your EMPLOYER or any  COMPANY. Except as otherwise provided below, you agree to assign and hereby assign your entire right, title and interest in all INVENTIONS (including, but not limited to, all related patent applications and all priority rights relating to any INVENTIONS or to any related patent applications) to your EMPLOYER or its designee.  You will not assert any rights to any INVENTIONS as having been made or

acquired by you prior to your being employed by your EMPLOYER unless such INVENTIONS are identified on a sheet attached hereto and signed by you and your EMPLOYER as of the date of this Agreement.

For any Minnesota employee, Section 1.2 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used to conceive or reduce to practice such INVENTION and which was developed entirely by you on your own time, and (a) which does not relate at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by you for your EMPLOYER.

For any California, Delaware, Illinois, Kansas, or North Carolina employee, Section 1.2 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) the INVENTION results from any work performed by you for your EMPLOYER.  For California employees, the requirement to assign your rights to an invention to your EMPLOYER does not apply to an invention which qualifies fully under the provisions of California Labor Code Section 2870.

For any State of Washington employee,  Section 1.2 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) directly to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, and (b) the INVENTION results from any work performed by you for your EMPLOYER.

1.3   All copyrightable works, including, but not limited to, writings, articles, publications, presentations, reports, computer programs, drawings, tables, graphs, images, artwork, photographs, videos, musical works, sound recordings and audiovisual works,  that you create or prepare during and within the scope of your employment with your EMPLOYER or relating to work performed for any COMPANY, whether or not created or prepared during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, and regardless whether the creation or preparation of such work was specifically requested by your EMPLOYER, shall be considered works made for hire, and the worldwide copyrights therein shall be the sole and exclusive property of your EMPLOYER or such COMPANY.  If any such copyrightable work or portion thereof shall not legally qualify as a work made for hire, or shall subsequently be held not to be a work made for hire, you agree to assign and hereby assign to your EMPLOYER, such COMPANY, or their designee all your right, title and interest therein.  You agree to promptly disclose all such works to your EMPLOYER.

1.4   You will execute any applications, assignments or other instruments that your EMPLOYER considers necessary to apply for, obtain, transfer and/or maintain a patent,  or trademark or copyright registration and/or other proprietary rights to protect the interests of your EMPLOYER or the COMPANY with respect to INVENTIONS,   and/or copyrightable works conceived, reduced to practice, created, authorized or made by you during your

employment.  These obligations shall continue beyond the termination of your employment and shall be binding upon your executors, administrators, and other legal representatives.

**2.    Confidential Information and Company Property**

2.1    For purposes of this AGREEMENT,"CONFIDENTIAL INFORMATION" means information or a compilation of information, in any form (tangible or intangible) about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you, made available to you, or known by you as a result of your employment within the COMPANY, including, but not limited to, the following information: product development, product performance, product know-how, product specifications, techniques, drawings, prints, designs, and tolerances; regulatory strategies, clinical trials and investigations; manufacturing, engineering, logistics, and quality systems and related processes, data and techniques; information systems, computer programs, software, and hardware configurations; business, financial, operating, sales and marketing plans and strategies; inventions, ideas, discoveries, improvements, innovations and intellectual property strategies; pricing and pricing strategies, forecasts, contract and bidding details, financial data, models and analyses, sales volume, sales data and analyses; customer, business partner and vendor relationships and arrangements; personnel data and compensation; human resources strategies and goals, recruitment methods and plans; and training methods and procedures.

2.2    You will not use or disclose to the COMPANY any confidential information belonging to others, including your former employers, if any.  You represent there is no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would prohibit or restrict your ability to perform your job-related duties that you have not disclosed and provided to your EMPLOYER.

2.3    Both during and after your employment within the COMPANY ends, you agree that, except as required in the course of your job responsibilities, you will not use or disclose any CONFIDENTIAL INFORMATION, or provide any third party with access to any CONFIDENTIAL INFORMATION, unless either (a) specifically authorized in writing by the COMPANY to which the CONFIDENTIAL INFORMATION relates or (b) as permitted by law where the disclosure is made (i) in confidence to a government official or to an attorney, either directly or indirectly, solely for the purpose of reporting or investigating a suspected violation of law; (ii) in a complaint or other document filed in a lawsuit or other proceeding, so long as any such filing is made under seal; or (iii) in a lawsuit or proceeding against an employer for retaliation based on the reporting of a suspected violation of law and/or to an attorney in any such lawsuit so long as any document containing the information is filed under seal and the information is not otherwise disclosed, except pursuant to court order.

2.4    Upon termination of your employment within the COMPANY (whether voluntary or involuntary), you agree to return all property in your possession or custody belonging to any COMPANY, including any CONFIDENTIAL INFORMATION, any COMPANY product, and any computer, phone, or other electronic device or equipment issued to you or paid for by any COMPANY during your employment.  Unless expressly authorized by the COMPANY in writing, you shall not make or retain copies of any CONFIDENTIAL INFORMATION or any correspondence, memoranda, reports, notebooks, drawings, photographs, purchasing or

invoicing records, or other documents relating in any way to the business of any COMPANY (in any form whatsoever, including information contained in computer memory or stored on any electronic storage device, including computer drives, other electronic devices, or cloud-based storage), that were entrusted to, created by, available to or obtained by you at any time during your employment within the COMPANY.

## 3.    Non-Competition and Future Employment

3.1    You agree that, during your employment within the COMPANY, you will not directly or indirectly, on your own or in combination with others, whether for your own benefit or for the benefit of other persons or entities, become involved in or engage in any activities (including preparations) which compete with, are intended to compete with or which otherwise may adversely affect or interfere with the COMPANY's business, whether immediately or in the future.

3.2    Except as provided in Section 3.3 below, you agree that, for a period of eighteen (18) months after the termination of your employment within the COMPANY (whether voluntary or involuntary), you will not directly or indirectly perform, or assist others to perform, work for a COMPETITOR in a position or in any geographic location in which you could disadvantage the COMPANY or advantage the COMPETITOR through (a) your disclosure or use of CONFIDENTIAL INFORMATION and/or (b) your use of the COMPANY's  CUSTOMER relationships and goodwill.  For employees who primarily live and work in California, this Section 3.2 shall not apply with respect to services rendered in California after termination of your employment.

3.3    After the termination of your employment within the COMPANY, you may work for a COMPETITOR provided that (a) the COMPETITOR has a DIVERSIFIED BUSINESS; (b) the role you seek to perform is not a role in which the COMPETITOR could benefit from the CONFIDENTIAL INFORMATION to which you have had access during the last two (2) years of your employment within the COMPANY; and (c) before you accept the position and begin work for the COMPETITOR, the COMPANY is provided, and has accepted as satisfactory to it, written assurances from both you and the COMPETITOR that you will not be rendering any services which conflict with the obligations in this AGREEMENT.  The written assurances must be sufficiently detailed to allow for an informed decision by the COMPANY including job title, position description and responsibilities, location, geographic scope, and the identity of the organization or business unit and the person(s) to whom you will be reporting.  For employees who primarily live and work in California, this Section 3.3 shall not apply with respect to services rendered in California after termination of your employment.

3.4    In the event of a voluntary termination of your employment from the COMPANY, including a resignation, you agree to notify your EMPLOYER in writing at least fourteen (14) days before your anticipated last date of employment.  You also agree during the eighteen (18) months after your employment ends to provide your EMPLOYER with fourteen (14) days' written notice of any new employment or any change in position with a COMPETITOR before assuming the new role to allow for the opportunity to obtain written assurances satisfactory to the COMPANY from you and from the COMPETITOR that you will not be rendering services which conflict with the obligations in this AGREEMENT. The written assurances shall contain the specific detail set out in Section 3.3 above.

Op-Co Headquarters
                                                                Positions – January 2017

3.5   If your employment within the COMPANY terminates for reasons other than misconduct, then you may be entitled to certain payments if you satisfy the requirements and procedures in Addendum A to this AGREEMENT.  If you voluntarily terminate or resign from your employment, then you will not be eligible to receive these payments.

3.6   For purposes of this AGREEMENT**,** "COMPETITOR" means any person or entity including, but not limited to, you or anyone acting on your behalf, that is engaged or preparing to be engaged in research, development, production, manufacturing, marketing or selling of, or consulting on, any product, process, technology, machine, invention or service in existence or under development that resembles, competes with, may now or in the future compete with, can be substituted for or can be marketed as a substitute for  any product, process, technology, machine, invention, or service of any COMPANY that is in existence or that is, was, or is planned to be under development.   "DIVERSIFIED BUSINESS" means that the COMPETITOR has distinct and separate lines of business which do not compete with any EMPLOYER for whom you have worked in the last two (2) years of your employment within the COMPANY.

## 4.   Non-Solicitation of Customers and Employees

4.1   During your employment within the COMPANY and for a period of eighteen (18) months after the termination of your employment (whether voluntary or involuntary), you agree that you will not, directly or indirectly, contact, call upon, solicit business from, sell to, render services to, and/or market services or products to any CUSTOMER.  You also agree you will not assist any person or entity in taking any of these actions.  The restrictions of this Section 4.1 will not apply with respect to services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

4.2   During your employment with any COMPANY and for a period of twelve (12) months after the termination of your employment (whether voluntary or involuntary), you agree that you will not directly or indirectly, on your own behalf or in combination with any other person or entity, engage in any activity which involves the solicitation or hiring of any individual then employed by any COMPANY with whom you have worked or who became known to you as a result of your employment within the COMPANY to leave his or her employment within the COMPANY.  The non-hire restrictions of this Section 4.2 will not apply with respect to services you render in California after termination of your employment.

4.3   For purposes of this AGREEMENT, "CUSTOMER" means any entity, client, account or person, including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts or persons, that you contacted, solicited any business from, sold to, rendered any service to, were assigned to, had management responsibilities for, received commissions or any compensation on, or promoted or marketed any products or services to, during the last twelve (12) months of your employment within the COMPANY.

## 5.   Breach of the Agreement and Remedies

5.1    You agree and acknowledge that your breach of the covenants contained in this AGREEMENT will cause irreparable harm to the COMPANY and that damages arising out of a breach may be difficult to determine. You therefore agree and acknowledge that, in addition to all other remedies provided at law or in equity, the COMPANY shall be entitled to specific performance and temporary and/or permanent injunctive relief, from any court of competent jurisdiction restraining the breach or further breaches by you, your new employer and others acting in concert with you, without the necessity of the COMPANY proving actual damages or posting of a bond.  The Court shall have the power to enforce any period of restriction from the date of the last breach up to a maximum of thirty-six (36) months.  In addition, if the COMPANY prevails in any suit under this AGREEMENT, in whole or in part, after having provided you an opportunity to cure the potential breach through expedited mediation before you commence employment in a position that may conflict with your obligations under this AGREEMENT, then you shall also be liable for the COMPANY's costs and attorney's fees in connection with the lawsuit and any related legal proceedings.

## 6.    General Provisions

6.1    This AGREEMENT will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules.  Any action relating to or arising out of this AGREEMENT may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both such courts and to service of process by United States mail or express courier service in any such action.   For employees who primarily live and work in California, this Section 6.1 shall not apply.

6.2    In the event any provision of this AGREEMENT is invalidated or not enforced under applicable law, this shall not affect the validity or enforceability of the remaining provisions of this AGREEMENT.   To the extent any provision of this AGREEMENT is unenforceable because it is deemed overbroad, the provision shall be applied and enforced in a more limited manner to the fullest extent permissible under the applicable law.

6.3    You acknowledge that your EMPLOYER is one of numerous entities within the Johnson & Johnson Family of Companies that have, or will have as the result of any future acquisition, merger, assignment or otherwise, an interest in your employment, and that each COMPANY is an express third-party beneficiary of this AGREEMENT.

6.4    You agree that any COMPANY may transfer, convey or assign this AGREEMENT and any of the COMPANY's rights or obligations, in whole or in part, to any existing or future affiliate of the COMPANY or to any third party, including in connection with any merger, sale of assets, sale of stock or any other form of acquisition or transaction that pertains to all or part of the business of any COMPANY, and you consent to any such transfer, conveyance or assignment.

6.5    No modification of or amendment to this AGREEMENT will be effective unless it is in writing and signed by you and by an authorized representative of your EMPLOYER.  You represent that you have not relied on any oral, written or other representation by any representative of the COMPANY concerning the subject matter of this AGREEMENT that is not expressly stated in this AGREEMENT and that the terms of this AGREEMENT, together with Addendum A, are fully stated herein.

Op-Co Headquarters
                                                                         Positions – January 2017

6.6    All previous non-competition, non-solicitation, confidentiality, non-disclosure and/or intellectual property agreements between you and the COMPANY shall remain in effect to the extent applicable therein.  In the event that this AGREEMENT is declared invalid, void, overbroad or unenforceable, in whole or in part, for any reason, then you understand, agree and acknowledge that any such previous agreements between you and the COMPANY may be enforced as applicable therein.

6.7    Nothing contained in this AGREEMENT shall be deemed to confer on you any rights with respect to the duration of your employment.  YOUR EMPLOYMENT IS TERMINABLE AT WILL BY EITHER YOUR EMPLOYER OR YOU, WITH OR WITHOUT CAUSE, EXCEPT THAT IF YOU INITIATE THE TERMINATION, THERE SHALL BE, AT YOUR EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER YOU GIVE WRITTEN NOTICE OF TERMINATION BEFORE IT BECOMES EFFECTIVE, during which you will provide such transitional services as your EMPLOYER may request and your EMPLOYER will continue your pay.

YOU ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, AND YOU AGREE TO THE TERMS ABOVE AND ACKNOWLEDGE THAT YOU INTEND TO BE LEGALLY BOUND BY THIS AGREEMENT.

DATE:  Jun 6, 2017

*Brandon Randall*
Brandon Randall (Jun 6, 2017)
_____
EMPLOYEE SIGNATURE

Brandon Randall
_____
Employee Name  (Please Print)

187 Tobey Garden St.
_____
Address

Duxbury, MA
_____
City/State

**ADDENDUM A**

A.     If, after at least a month following the termination of your employment within the COMPANY, for reasons other than misconduct or your voluntary resignation, and after a diligent search for employment that complies with the terms of the AGREEMENT, you are unable to obtain employment in a position in which your annual base salary is at least equal to your annual base salary at the time of such termination solely because of the restrictions set forth in Sections 3.2 and/or 3.3 of this AGREEMENT, then, commencing after submission of an application for payment and any additional requested information and documents and a determination by your EMPLOYER in due course that you qualify for payment, your EMPLOYER shall make monthly payment to you equal to the lesser of (i) the amount you last received each month from your EMPLOYER pursuant to an annual base salary or (ii) the difference between your last annual base salary at your EMPLOYER and your annual base salary (per month) in any subsequent position for each month for which you properly apply for payment and your EMPLOYER determines your entitlement.   Your annual base salary for or with any subsequent employer will be based on your EMPLOYER's reasonable projection of the amounts to be received by you during the first twelve (12) months in that employment.  No payment shall be made in advance of the month for which it is requested.

B.     To be considered for the payments provided for in Paragraph A above for each month that you claim payment is due, you must establish and represent in writing to the highest-ranking employee in the Human Resources organization of your EMPLOYER, within fifteen (15) days following the end of each month that you are seeking payment, that although you diligently sought work in the prior month consistent with your obligations under Sections 3.2 and/or 3.3 of the AGREEMENT, you were unable to attain employment from a new employer in a position in which your annual base salary equaled the annual base salary you last received from your EMPLOYER, solely because of a restriction set forth in Sections 3.2 and/or 3.3 of the AGREEMENT.  You must also submit a completed Application for Payment Pursuant to Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement and promptly provide such further information or documents concerning your job search as your EMPLOYER may request to verify the accuracy of your representations.

C.     In the event that you are offered a position which you believe conflicts with your obligations under either Section 3.2 or 3.3 of the AGREEMENT, you must inform your EMPLOYER so that your EMPLOYER may evaluate the position and consider whether the position may be allowable under the terms of this AGREEMENT or permissible with appropriate restrictions.  No payment shall be due under Paragraph A if you fail to make timely application for or to provide on a timely basis any information or documents requested by your EMPLOYER or required under this Addendum or if you provide incomplete or inaccurate information regarding your job search.

D.     If your EMPLOYER determines that you are entitled to payment under Paragraph A, your EMPLOYER may elect in its sole discretion, in lieu of payment, to provide you a written release from all or part of the restrictions of Sections 3.2 or 3.3 of the AGREEMENT.  In the event your EMPLOYER elects to provide such written release, EMPLOYER will no longer be obligated to make any payments contemplated by Paragraph A above.

# EXHIBIT B

**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky, Esq.
New Jersey Resident Partner
Michael R. Darbee, Esq.
300 Carnegie Center Drive, Suite 220
Princeton, New Jersey 08540
Phone: (609) 750-2646
Fax: (609) 897-7286
Orlofsky@BlankRome.com
MDarbee@BlankRome.com

**BLANK ROME LLP**
*A Pennsylvania LLP*
Anthony B. Haller, Esq. (*pro hac vice forthcoming*)
William R. Cruse, Esq. (*application for admission forthcoming*)
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998
Phone: (215) 569-5690
Fax: (215) 832-5690
Haller@BlankRome.com
Cruse@BlankRome.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ETHICON, INC. and MEDICAL DEVICE BUSINESS SERVICES, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> BRANDON RANDALL, <br><br> *Defendant*. | Civil Action No.: <br><br><br> ***Electronically Filed*** <br><br> **VERIFIED COMPLAINT** |

Plaintiffs Ethicon, Inc. ("Ethicon") and Medical Device Business Services, Inc. ("DePuy Synthes") (collectively, "Plaintiffs") hereby file this Verified Complaint against Defendant Brandon Randall ("Randall") and allege as follows:

## NATURE OF THE ACTION

1.      In this action, Plaintiffs seek to prevent irreparable harm as a result of the impending threat by Randall to assume the position of "Head of Robotics" reporting to the President of Research and Development for Smith & Nephew plc ("Smith & Nephew"), a direct competitor, in breach of his Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement with Plaintiffs[1] because, *inter alia*, he has had access to competitively critical trade secret and confidential information of Plaintiffs directly related to this intended role and he could significantly disadvantage Plaintiffs by his use or disclosure of this information.

2.      Randall held high-level positions of trust and confidence with Plaintiffs, most recently as the effective Chief Of Staff to the Head of Research and Development for Depuy Synthes, with the title Senior Director, Research and Development Strategy and Business Operation, and then Senior Director, Integration Programs, Robotics and Digital Solutions for Ethicon. In these roles Randall had access to the highly sensitive and proprietary information about Plaintiffs' robotic and digital surgery systems including its end-to-end strategy. If this information were disclosed, it could advantage Smith & Nephew and

---

[1] A copy of this agreement is attached hereto as **Exhibit A**.

disadvantage Plaintiffs in a manner that cannot be compensated in monetary damages.

3.      Plaintiffs and Smith & Nephew are engaged in a capital-intensive and highly competitive race to develop innovative and key enabling technologies for state-of-the-art medical device systems involving robotics, navigation, augmented reality, and visualization including in the areas of wound closure, trauma, orthopedic, and joint reconstruction surgery. By way of example, DePuy Synthes has announced its intended launch of a new knee reconstruction robotics system which is not yet on the market. Smith & Nephew has or is developing products to compete directly with this system. DePuy Synthes and Ethicon are jointly developing trade secret and innovative digital data analytical ecosystems to support robotic products under development. Randall has had access to the end-to-end strategy in relation to this closely held research and development program.

4.      Plaintiffs face irreparable harm through the advertent or inadvertent disclosure of their proprietary, confidential, and trade secret information to Smith & Nephew if Randall is permitted to assume his intended position with Smith & Nephew. This role involves assuming responsibility for a direct competitor in areas which overlap directly with the trade secret and confidential information to which Randall had access while working for Plaintiffs in his recent roles.

3

5.     Due to the nature of the risk of irreparable harm, Plaintiffs are requesting immediate injunctive relief to ensure Randall's compliance with his post-employment obligations and to protect against the imminent risk that their confidential, proprietary, and trade secret information will be used or disclosed.

## **THE PARTIES**

6.     Plaintiff Ethicon, Inc. is a New Jersey corporation with its principal place of business in West Somerville, New Jersey. It is a wholly owned subsidiary of Johnson & Johnson ("J&J") and is therefore an entity within the Johnson & Johnson Family of Companies and a "Company" as that term is defined in Randall's Agreement as described herein.

7.     Plaintiff Medical Device Business Services, Inc. (f/k/a DePuy Orthopaedics, Inc) is an Indiana corporation with its principal place of business in Warsaw, Indiana, is a wholly-owned subsidiary of Synthes, Inc., which is a wholly-owned subsidiary of DePuy Synthes, Inc, which, in turn, is a wholly-owned subsidiary of Johnson & Johnson International, a subsidiary of J&J.

8.     Randall is an individual who maintains a residence at 187 Tobey Garden Street, Duxbury, Massachusetts. Upon information and belief, Randall's planned position with Smith & Nephew is based in or around Pittsburgh, Pennsylvania.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. This is an action between parties of diverse citizenship with an amount in controversy that exceeds $75,000.

10.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the parties have consented to exclusive jurisdiction in this court of any dispute arising out of the "Agreement." *See* Ex. A ¶ 6.1.

## FACTUAL BACKGROUND

### I.      PLAINTIFFS' BUSINESS RELIES ON CONFIDENTIAL AND PROPRIETARY AND TRADE SECRET INFORMATION

11.      The J&J Family of Companies is comprised of over 260 companies, which together operate the world's largest and most diverse medical device, pharmaceutical and consumer products company. The J&J Family of Companies operates generally in three broad divisions: Consumer Healthcare; Medical Devices; and Pharmaceuticals. The businesses in which these entities are engaged are extremely competitive.

12.      Ethicon and DePuy Synthes are two key businesses within J&J's Medical Devices segment and, as wholly owned subsidiaries of J&J, are part of the J&J Family of Companies.

13.      DePuy Synthes is a worldwide leader in the medical device industry with a focus on implants and instrumentation for use in orthopedic surgery for the

repair and healing of the musculoskeletal system. DePuy Synthes' products include, among other things, plates and screws for the healing of traumatic injuries, products used in spine surgery, and joint replacement products like knees, hips, and shoulders.

14.     Ethicon develops, manufactures, and markets sutures, ligatures, staplers, and other wound-closing products. Ethicon is a global market leader in this business, and its primary focus is to develop and create innovative products and medical devices for use in surgery.

15.     The medical device industry in which Plaintiffs are engaged is highly competitive. In order to compete and better serve both its customers and the patient community, Plaintiffs invest millions of dollars annually in the development of technologies, systems, and products designed to optimize patient outcomes and advance medical science. As a result, the protection of confidential, proprietary, and trade secret information is vital to protect Plaintiffs' investment in product development efforts and to prevent competitors or would-be competitors from obtaining an unfair competitive advantage.

16.     Plaintiffs' business relationships and confidential information are protected among other things by requiring key employees, like Randall, as a condition of employment, to agree not to disclose confidential and/or proprietary information, not to solicit customers, and not to compete in a position that would

compromise the confidential information for a reasonable period of time following employment.

17.     This lawsuit concerns an area of current intense focus and competition in the medical device industry: the field of enabling technologies, surgical robotics, computer vision, artificial intelligence and digital surgery ecosystems. These systems incorporate robotic surgical devices with advanced software and data collection and analytics tools to create actionable insights for hospitals, physicians and patients with the aim of improving surgical outcomes.

## II.    RANDALL'S CAREER WITH PLAINTIFFS IN RESEARCH AND DEVELOPMENT INVOLVED EXTENSIVE ACCESS TO THE PLAINTIFFS' CONFIDENTIAL AND TRADE SECRET BUSINESS INFORMATION

18.     Over the course of his seventeen (17) year career with Plaintiffs, Randall has worked for several companies within the Johnston & Johnson Family of Companies and has been privy to their confidential and trade secret information.

19.     From October 2003 through the first half of 2017, Randall rose through the ranks of the product development division of J&J's Medical Device business, focusing on the design and development of innovative spinal implants and instrumentation.

20.     In June 2017, Randall was promoted to the position of Senior Director, Research and Development Strategy and Business Operations for

orthopedics. As Randall, himself, states in his publicly available LinkedIn profile, in this position he:

      a.    Provided direct Chief-of-Staff support to the Head of R&D for J&J's orthopedic medical device products;

      b.    Managed all aspects of Depuy Synthes R&D leadership team, including formulation of annual goals and objectives, organization design, resource planning, and time to market reduction initiatives; and

      c.    Drove awareness of portfolio value metrics and set targets with leadership team to improve portfolio value across Joints, Trauma, Spine, and Sports businesses.

21.    In connection with his responsibilities as the "Chief-of-Staff" to the Head of R&D for J&J's orthopedic medical device products, Randall had access to confidential, trade secret, and proprietary information. The information to which he had access included, without limitation:

      a.    product development, product performance, product know-how, product specifications, techniques, drawings, prints, designs, and tolerances;

      b.    manufacturing, engineering, logistics, and quality systems and related processes, data and techniques; and

      c.    inventions, ideas, discoveries, improvements, innovations and intellectual property strategies.

22.    In this position Randall necessarily had access to and knowledge of Plaintiffs' research and development and business strategies and goals for its orthopedic product business line and he was involved in projects related to the

research and development of digital and robotic surgical technologies. As Randall states in his LinkedIn profile, he:

  a. Actively led several strategic programs with external partners to identify collaboration opportunities in the fields of enabling technologies, surgical robotics, computer vision & artificial intelligence;

  b. Managed multiple aspects of strategic relationship between J&J and its partners to drive progress in surgical robotics and adjacent areas;

  c. Established program management capabilities and operational model design for digital surgery teams within J&J's various businesses; and

  d. On-boarded and worked with leaders within robotics, digital solutions, surgical decision support, and sensors and wearable digital products to drive innovation.

23. In this role, Mr. Randall had access to Plaintiffs' digital and robotic surgery strategy and implementation plans. Mr. Randall was a key contributor to the development and organization of Plaintiffs' digital organization working model and workstreams across product lines, in which leaders from across J&J developed the vision, design principles, organizational structure, and implementation plans to drive this new critical area of competition in the medical device market.

24. In July 2019, Randall assumed a role with Ethicon as its Senior Director, Integration Programs, Robotics and Digital Solutions, but he continued his responsibilities as Chief-of-Staff of research and development of orthopedic medical devices until October 2019.

25.    At Ethicon, Randall's focus remained on J&J's global and cross-company efforts to develop innovative robotic and digital surgical solutions and products. Indeed, a principal objective of his in 2020 was digital surgery, including research and development of surgical robotics, specialty robotics, digital solutions, and their integration. In his most recent performance review he credited himself for helping "shape our [*i.e.*, Plaintiffs'] Digital Surgery strategy going forward."

26.    As recently as August 3, 2020, Mr. Randall had access to a proprietary strategic presentation involving information related to the entire digital and robotics strategy across the J&J medical device businesses, including orthopedics, with reference to proprietary information about the product pipeline, pilot and launch plans and timing, technology capabilities, and plans as related to digital surgery ecosystem technology.

27.    While working at Ethicon, Mr. Randall authored contributions to a series of updates on digital and robotic technologies. In a January 24, 2020 presentation entitled "Digital Surgery Technology Update," Mr. Randall reviewed the digital surgery architecture vision and implementation plans, the status of the platform projects, and next steps for both the orthopedic and general surgery business lines.

28.    Both at DePuy Synthes and at Ethicon, Randall had access to and knowledge of J&J's sensitive and proprietary product development information

10

concerning this highly competitive and innovative business line. Randall helped create and was privy to information related to the development and launch strategies for Plaintiffs' digital and robotic ecosystems, including, but not limited to, its robotic knee system under development, with visibility to the Plaintiffs' end-to-end strategy which is closely held. In his own words, Randall stated in a recent performance review that he "enabled the Digital Surgery business to deliver our commitments while shaping the future."

29.    Randall likewise was privy to Plaintiffs' research and product development strategies in both the orthopedic medical device and wound closure areas, including product launch strategies and the timetable of Plaintiffs' orthopedic product pipeline. In these key competitive areas, Randall had access to Plaintiffs' annual goals and objectives, organization design, resource planning, and time to market initiatives.

30.    As a result the trade secret and confidential to which Randall had access intersects directly with his intended role at Smith & Nephew and includes Plaintiffs' vision, strategy, objectives, design principles, technology capabilities, configuration, pipeline, organizational planning, and competitive positioning for its robotic and digital systems.

31.    Randall also had access to confidential information about key surgeon relationships, acquisition targets, key sourcing and vendor relationships, project

requirements, inventory capabilities, integration planning for robotic and digital surgery and other material aspects of Plaintiffs development and commercialization strategies.

## III. RANDALL'S OBLIGATIONS UNDER THE EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

32.     In connection with his promotion to Senior Director, Research and Development and Business Operations, with DePuy Synthes, Randall signed an Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (the "Agreement"). *See* **Exhibit A** (attached).

33.     As stated in the Agreement, Randall acknowledged that his position within the Johnson & Johnson Family of Companies "involves a position of trust and confidence in which you will have access to confidential, proprietary, and secret information, the disclosure of which would cause the COMPANY [as defined therein] to suffer substantial and irreparable harm." Ex. A at 1.

34.     Randall further acknowledged that his "activities will, directly or indirectly, support the COMPANY's business, research and development efforts, business and customer relationships, reputation and goodwill, all of which are valuable interests, which if used or diverted to a competitor, would result in irreparable harm." *Id.*

12

35.     Pursuant to the Agreement, Randall agreed that both during and after his employment with Plaintiffs ends, he would not "use or disclose any CONFIDENTIAL INFORMATION or provide any third party with access to any CONFIDENTIAL INFORMATION." *Id.* ¶ 2.3. The Agreement defines CONFIDENTIAL INFORMATION as follows:

> product development, product performance, product know-how, product specifications, techniques, drawings, prints, designs, and tolerances; regulatory strategies, clinical trials and investigations; manufacturing, engineering, logistics, and quality systems and related processes, data and techniques; information systems, computer programs, software, and hardware configurations; business, financial, operating, sales and marketing plans and strategies; inventions, ideas, discoveries, improvements, innovations and intellectual property strategies; pricing and pricing strategies, forecasts, contract and bidding details, financial data, models and analyses, sales volume, sales data and analyses; customer, business partner and vendor relationships and arrangements; personnel data and compensation; human resources strategies and goals, recruitment methods and plans; and training methods and procedures.

*Id.* ¶ 2.1.

36.     Randall further agreed that, for a period of eighteen (18) months after his last date of employment with Plaintiffs, he would not:

> directly or indirectly perform . . . work for a COMPETITOR [as that term is defined in the Agreement] in a position . . . in which [he] could disadvantage the COMPANY or advantage the COMPETITOR through (a) [his] disclosure or use of CONFIDENTIAL INFORMATION and/or (b) [his] use of the COMPANY's [customer] relationships and goodwill.

13

*Id.* ¶ 3.2.

37.    "COMPETITOR" is defined in the Agreement as:

> any person or entity including, but not limited to, you or anyone
> acting on your behalf, that is engaged or preparing to be engaged
> in research, development, production, manufacturing, marketing
> or selling of, or consulting on, any product, process, technology,
> machine, invention, or service in existence or under development
> that resembles, competes with, may now or in the future compete
> with, can by substituted for or can be marketed as a substitute for
> any product, process, technology, machine, invention or service
> of any COMPANY that is in existence or that is, was, or is
> planned to be under development.

*Id.* ¶ 3.6.

38.    The Agreement contains a limitation on the non-compete provision in

Section 3.3., which provides that Randall ***could*** work for a competitor ***if***:

> (a) the competitor "has a DIVERSIFIED BUSINESS [as that
> term is defined in the Agreement]; (b) the role [he] seek[s] to
> perform is not a role in which the COMPETITOR could benefit
> from the CONFIDENTIAL INFORMATION to which [Randall]
> had access during the last two (2) years of [his] employment
> within the COMPANY; and (c) before [he] accept[s] the position
> and begin[s] work for the COMPETITOR, the COMPANY is
> provided, and has accepted as satisfactory to it, written
> assurances from both [Randall] and the COMPETITOR that
> [Randall] will not be rendering any services which conflict with
> the obligations in this AGREEMENT.

*Id.* ¶ 3.3.

39.    With respect to his proposed position with Smith & Nephew as

described below, Randall has never provided Plaintiffs with satisfactory written

14

assurance that he would not render services to Smith & Nephew that conflict with his obligations under the Agreement.

40.     The Agreement also contains an Addendum A that provides for payments to Randall in the event that he is "unable to obtain employment in a position in which [his] annual base salary is at least equal to [his] annual base salary at the time of [his] termination solely because of" the non-compete and non-solicitation restrictions in the Agreement, and subject to his satisfaction of other conditions contained in the Addendum including notice to the appropriate person in writing of his efforts to find employment that complies with his obligations under the Agreement. *Id.* at Addendum A thereto.

41.     Randall acknowledged, by executing the Agreement, that violation of the Agreement "will cause irreparable harm" to Plaintiffs and that they "shall be entitled to specific performance and temporary and/or permanent injunctive relief from any court of competent jurisdiction restraining the breach or further breaches by [Randall] . . . without the necessity of the COMPANY proving actual damages or posting of a bond." *Id.* ¶ 5.1.

## IV. RANDALL'S NEW POSITION WITH SMITH & NEPHEW VIOLATES HIS OBLIGATIONS UNDER THE AGREEMENT AND THREATENS PLAINTIFFS' SENSITIVE, CONFIDENTIAL, AND PROPRIETARY INFORMATION

42.     On or around August 31, 2020, Randall announced his resignation and then, on September 4, 2020, his decision to take the position of "Head of Robotics" with Smith & Nephew, which competes directly with Plaintiffs in the areas of researching, developing, and marketing wound closure, trauma, and joint reconstruction medical devices, as well as developing robotic and digital platforms for surgeries using these products.

43.     As stated in the "Position Specification" for Randall's proposed job with Smith & Nephew, the Head of Robotics reports directly to Smith & Nephew's Head of Research and Development and "lead[s] a multi-site, multi-disciplinary global team to transform the innovation pipeline across the enterprise."[2]

44.     Randall will be required to work with product development teams "across [Smith & Nephew's] "enterprise" to "provide leadership to all phases of the product development life cycle" and "[i]nterface with all functions including R&D, Sales, Marketing, Finance, Operations, Compliance, Regulatory Affairs to

---

[2] A copy of the Smith & Nephew job description for the "Head of Robotics" position will be made available to the Court upon request.

support the product portfolio, drive successful new product introductions and launches, and accomplish departmental and company goals/objectives."

45.     As Smith & Nephew's "Head of Robotics," Randall will be required to "drive the incorporation of key enabling technologies like robotics, navigation, augmented reality, and visualization," and will "be responsible for driving the overall strategy of Smith & Nephew's Digital Surgery ecosystem." Randall will also be required to "provide leadership to all phases of the product development life cycle for Robotics R&D including early innovation, technology development, new product development, and product support."

46.     Smith & Nephew competes directly and head-to-head with Plaintiffs in the medical device industry, including in the orthopedic, sports medicine and wound closure product markets and in the developing field of robotics and connected digital ecosystems.

47.     Randall's intended role as Smith & Nephew's "Head of Robotics" requires him to be involved in the development of high level strategies and enabling technologies where the information to which he had access in his recent roles with Plaintiffs has direct market relevance and application and which could advantage and directly benefit Smith & Nephew. Randall's Agreement is intended to avoid such harm and expressly prohibits him for a period of eighteen (18) months from assuming such a position.

48.     Randall's new position with Smith & Nephew will inevitably require him to use and disclose the confidential, proprietary, and trade secret information that he has acquired in his positions of trust and confidence with Plaintiffs.

## V.     IRREPARABLE HARM TO PLAINTIFFS

49.     By working for a direct competitor of Plaintiffs in the intended position after having had such broad and extensive access to highly sensitive information of Plaintiffs, Randall is in direct violation of his obligations under the Agreement.

50.     Plaintiffs will suffer immediate and irreparable harm unless Randall is enjoined from breaching his Agreement. Among other things, Plaintiffs will suffer the loss of valuable confidential and proprietary information, as well as the concomitant loss of competitive advantage, including loss of market share and potentially the loss of market-leading positions that are entitled to protection under the law. It will be very difficult, if not impossible, to calculate the loss and damage resulting from Randall's breach of his Agreement.

51.     There is no adequate remedy at law for the irreparable harm that Plaintiffs will suffer unless Randall is enjoined from breaching his Agreement.

52.     Injunctive relief is necessary to preserve the status quo and restore the parties to the situation that existed immediately before Randall began engaging in wrongful conduct.

53.     Additionally, injunctive relief is appropriate in these circumstances because Plaintiffs will most likely prevail on the merits and the balancing of equities favors Plaintiffs.

## COUNT ONE – BREACH OF CONTRACT

54.     Plaintiffs hereby incorporate the allegations contained in the preceding paragraphs as if set forth fully herein.

55.     Randall agreed, for a period of eighteen months following his employment, not to perform work for any competitor in any position in which he could disadvantage Plaintiffs or advantage the competitor by his disclosure or use of confidential information to which he had access.

56.     During the last two years of his employment, Randall had significant and extensive access to a broad array of confidential and proprietary information related to the Plaintiffs' research and development efforts and business generally and, in particular, with respect to the development of digital and robotic surgical platforms.

57.     Randall held positions of trust and confidence in which he had access to confidential and trade secret information which could disadvantage Plaintiffs and advantage Smith & Nephew if used or disclosed.

58.     Plaintiffs have taken adequate measures to protect the confidentiality of this information, including requiring Randall to sign the Agreement, which

expressly prohibits him from working for a competitor in any capacity in which he could harm Plaintiffs or benefit a competitor by his use or disclosure of such information.

59. Smith & Nephew is a direct competitor of Plaintiffs and if Smith & Nephew gains access to the confidential information to which Randall had access, Plaintiffs will suffer immediate and irreparable harm to its business.

60. Randall plans to begin his employment with Smith & Nephew immediately, and, thus, is or will be in a position in which his use or disclosure of Plaintiffs' confidential information could damage Plaintiffs and advantage Smith & Nephew.

61. Randall acknowledged, by executing the Agreement, that violation of the Agreement "will cause irreparable harm" to Plaintiffs and that they "shall be entitled to specific performance and temporary and/or permanent injunctive relief from any court of competent jurisdiction restraining the breach or further breaches by [Randall] . . . without the necessity of the COMPANY proving actual damages or posting of a bond." *Id.* ¶ 5.1.

**WHEREFORE**, Plaintiffs Ethicon, Inc. and Medical Device Business Services, Inc. seek the following relief:

A. An order enforcing the terms of Randall's Agreement, including an injunction prohibiting Randall from directly or indirectly performing work for Smith & Nephew for a period of eighteen (18) months in any

position in which he could disadvantage Plaintiffs or advantage Smith & Nephew or any other competitor of the companies by the disclosure or use of confidential information to which he had access while employed with the Plaintiffs, including, without limitation, the position of "Head of Robotics" or any other position with responsibilities for Smith & Nephew's digital and/or robotic surgery products and services

B.    Compensatory damages in an amount to be determined at trial;

C.    Attorney's fees and costs of suit; and

D.    Such other and further relief as the Court deems just and reasonable.

Dated: September 29, 2020          */s/ Stephen M. Orlofsky*

**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky, Esq.
New Jersey Resident Partner
Michael R. Darbee, Esq.
300 Carnegie Center Drive, Suite 220
Princeton, New Jersey 08540
Phone: (609) 750-2646
Fax: (609) 897-7286
Orlofsky@BlankRome.com
MDarbee@BlankRome.com

**BLANK ROME LLP**
*A Pennsylvania LLP*
Anthony B. Haller, Esq. (*pro hac vice forthcoming*)
William R. Cruse, Esq. (*application for admission forthcoming*)
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998
Phone: (215) 569-5690

21

Fax: (215) 832-5690
Haller@BlankRome.com
Cruse@BlankRome.com
*Attorneys for Plaintiffs*

## **VERIFICATION**

I, Laurel Placeway, verify that I am Head of Human Resources, Research and Development Medical Device Sector, for the Johnson & Johnson Family of Companies, which includes the plaintiffs in the above-referenced matter, Medical Device Business Services, Inc. and Ethicon, Inc. Accordingly, I am authorized to make this Verification on behalf of Medical Device Business Services, Inc. and Ethicon, Inc. and the facts in the foregoing Complaint are true and correct to the best of my knowledge or information and belief, and are made subject to the provisions of 28 U.S.C. § 1746, relating to unsworn falsification to authorities.

LAUREL PLACEWAY

## CERTIFICATION PURSUANT TO LOCAL CIV. R. 11.2

I, Stephen M. Orlofsky, hereby certify pursuant to Local Civil Rule 11.2 that the matter in controversy is not the subject of any other action pending an any court, or of any pending arbitration or administrative proceeding.

Dated: September 29, 2020

_s/ Stephen M. Orlofsky_
STEPHEN M. ORLOFSKY

# Exhibit A

## EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION
## AND NON-SOLICITATION AGREEMENT

Name of Employee: <u>Brandon Randall</u>

Employee WWID: <u>418091</u>

**Depuy Orthopaedics. Inc.** (the "EMPLOYER") is one of numerous entities within the Johnson & Johnson Family of Companies (individually and/or collectively, the "COMPANY"). The businesses in which the COMPANY is engaged are extremely competitive. Your role involves a position of trust and confidence in which you will have access to confidential, proprietary, and secret information, the disclosure of which would cause the COMPANY to suffer substantial and irreparable harm. In your role, your activities will, directly or indirectly, support the COMPANY's business, research and development efforts, business and customer relationships, reputation and goodwill, all of which are valuable interests, which if used or diverted to benefit a competitor, would result in irreparable harm.

To protect these interests and for good and valuable consideration including, without limitation, your employment in a position of trust and confidence, your compensation and benefits, your access to confidential, proprietary, and secret information, and the opportunity to develop, maintain and enhance business and customer relationships, this Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (the "AGREEMENT") establishes certain obligations during and after your employment. This AGREEMENT applies to your current position and any position of trust and confidence you may hold (whether by promotion, transfer or assignment) within the COMPANY.

## 1.      Disclosure and Assignment of Inventions and Works

1.1    For purposes of this AGREEMENT, "INVENTIONS" means (a) discoveries, improvements, ideas, concepts, research, data, reports, plans, systems, technology, products, methods, and processes, whether or not patentable, and (b) trademarks, service marks, trade dress, design marks, design rights, logos, domain names, handles, user names, and trade names, whether or not registered.

1.2    You will disclose promptly in writing to your EMPLOYER or its designee all INVENTIONS conceived, created and/or reduced to practice by you during your employment whether or not during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, either solely or jointly with another or with others, and related to the actual or anticipated business or activities of your EMPLOYER or any COMPANY, or related to their actual or anticipated research and development or suggested by or resulting from any task assigned by you or work performed by you for, or on behalf of, your EMPLOYER or any COMPANY. Except as otherwise provided below, you agree to assign and hereby assign your entire right, title and interest in all INVENTIONS (including, but not limited to, all related patent applications and all priority rights relating to any INVENTIONS or to any related patent applications) to your EMPLOYER or its designee.  You will not assert any rights to any INVENTIONS as having been made or

acquired by you prior to your being employed by your EMPLOYER unless such INVENTIONS are identified on a sheet attached hereto and signed by you and your EMPLOYER as of the date of this Agreement.

For any Minnesota employee, Section 1.2 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used to conceive or reduce to practice such INVENTION and which was developed entirely by you on your own time, and (a) which does not relate at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by you for your EMPLOYER.

For any California, Delaware, Illinois, Kansas, or North Carolina employee, Section 1.2 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) the INVENTION results from any work performed by you for your EMPLOYER.  For California employees, the requirement to assign your rights to an invention to your EMPLOYER does not apply to an invention which qualifies fully under the provisions of California Labor Code Section 2870.

For any State of Washington employee,  Section 1.2 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) directly to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, and (b) the INVENTION results from any work performed by you for your EMPLOYER.

1.3    All copyrightable works, including, but not limited to, writings, articles, publications, presentations, reports, computer programs, drawings, tables, graphs, images, artwork, photographs, videos, musical works, sound recordings and audiovisual works,  that you create or prepare during and within the scope of your employment with your EMPLOYER or relating to work performed for any COMPANY, whether or not created or prepared during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, and regardless whether the creation or preparation of such work was specifically requested by your EMPLOYER, shall be considered works made for hire, and the worldwide copyrights therein shall be the sole and exclusive property of your EMPLOYER or such COMPANY.  If any such copyrightable work or portion thereof shall not legally qualify as a work made for hire, or shall subsequently be held not to be a work made for hire, you agree to assign and hereby assign to your EMPLOYER, such COMPANY, or their designee all your right, title and interest therein.  You agree to promptly disclose all such works to your EMPLOYER.

1.4    You will execute any applications, assignments or other instruments that your EMPLOYER considers necessary to apply for, obtain, transfer and/or maintain a patent,  or trademark or copyright registration and/or other proprietary rights to protect the interests of your EMPLOYER or the COMPANY with respect to INVENTIONS,  and/or copyrightable works conceived,  reduced  to  practice,  created,  authorized  or  made  by  you  during  your

Op-Co Headquarters
Positions – January 2017

employment.  These obligations shall continue beyond the termination of your employment and shall be binding upon your executors, administrators, and other legal representatives.

## 2.    Confidential Information and Company Property

2.1   For purposes of this AGREEMENT,"CONFIDENTIAL INFORMATION" means information or a compilation of information, in any form (tangible or intangible) about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you, made available to you, or known by you as a result of your employment within the COMPANY, including, but not limited to, the following information: product development, product performance, product know-how, product specifications, techniques, drawings, prints, designs, and tolerances; regulatory strategies, clinical trials and investigations; manufacturing, engineering, logistics, and quality systems and related processes, data and techniques; information systems, computer programs, software, and hardware configurations; business, financial, operating, sales and marketing plans and strategies; inventions, ideas, discoveries, improvements, innovations and intellectual property strategies; pricing and pricing strategies, forecasts, contract and bidding details, financial data, models and analyses, sales volume, sales data and analyses; customer, business partner and vendor relationships and arrangements; personnel data and compensation; human resources strategies and goals, recruitment methods and plans; and training methods and procedures.

2.2   You will not use or disclose to the COMPANY any confidential information belonging to others, including your former employers, if any.  You represent there is no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would prohibit or restrict your ability to perform your job-related duties that you have not disclosed and provided to your EMPLOYER.

2.3   Both during and after your employment within the COMPANY ends, you agree that, except as required in the course of your job responsibilities, you will not use or disclose any CONFIDENTIAL INFORMATION, or provide any third party with access to any CONFIDENTIAL INFORMATION, unless either (a) specifically authorized in writing by the COMPANY to which the CONFIDENTIAL INFORMATION relates or (b) as permitted by law where the disclosure is made (i) in confidence to a government official or to an attorney, either directly or indirectly, solely for the purpose of reporting or investigating a suspected violation of law; (ii) in a complaint or other document filed in a lawsuit or other proceeding, so long as any such filing is made under seal; or (iii) in a lawsuit or proceeding against an employer for retaliation based on the reporting of a suspected violation of law and/or to an attorney in any such lawsuit so long as any document containing the information is filed under seal and the information is not otherwise disclosed, except pursuant to court order.

2.4   Upon termination of your employment within the COMPANY (whether voluntary or involuntary), you agree to return all property in your possession or custody belonging to any COMPANY, including any CONFIDENTIAL INFORMATION, any COMPANY product, and any computer, phone, or other electronic device or equipment issued to you or paid for by any COMPANY during your employment.  Unless expressly authorized by the COMPANY in writing, you shall not make or retain copies of any CONFIDENTIAL INFORMATION or any correspondence, memoranda, reports, notebooks, drawings, photographs, purchasing or

invoicing records, or other documents relating in any way to the business of any COMPANY (in any form whatsoever, including information contained in computer memory or stored on any electronic storage device, including computer drives, other electronic devices, or cloud-based storage), that were entrusted to, created by, available to or obtained by you at any time during your employment within the COMPANY.

## 3. Non-Competition and Future Employment

3.1 You agree that, during your employment within the COMPANY, you will not directly or indirectly, on your own or in combination with others, whether for your own benefit or for the benefit of other persons or entities, become involved in or engage in any activities (including preparations) which compete with, are intended to compete with or which otherwise may adversely affect or interfere with the COMPANY's business, whether immediately or in the future.

3.2 Except as provided in Section 3.3 below, you agree that, for a period of eighteen (18) months after the termination of your employment within the COMPANY (whether voluntary or involuntary), you will not directly or indirectly perform, or assist others to perform, work for a COMPETITOR in a position or in any geographic location in which you could disadvantage the COMPANY or advantage the COMPETITOR through (a) your disclosure or use of CONFIDENTIAL INFORMATION and/or (b) your use of the COMPANY's CUSTOMER relationships and goodwill. For employees who primarily live and work in California, this Section 3.2 shall not apply with respect to services rendered in California after termination of your employment.

3.3 After the termination of your employment within the COMPANY, you may work for a COMPETITOR provided that (a) the COMPETITOR has a DIVERSIFIED BUSINESS; (b) the role you seek to perform is not a role in which the COMPETITOR could benefit from the CONFIDENTIAL INFORMATION to which you have had access during the last two (2) years of your employment within the COMPANY; and (c) before you accept the position and begin work for the COMPETITOR, the COMPANY is provided, and has accepted as satisfactory to it, written assurances from both you and the COMPETITOR that you will not be rendering any services which conflict with the obligations in this AGREEMENT. The written assurances must be sufficiently detailed to allow for an informed decision by the COMPANY including job title, position description and responsibilities, location, geographic scope, and the identity of the organization or business unit and the person(s) to whom you will be reporting. For employees who primarily live and work in California, this Section 3.3 shall not apply with respect to services rendered in California after termination of your employment.

3.4 In the event of a voluntary termination of your employment from the COMPANY, including a resignation, you agree to notify your EMPLOYER in writing at least fourteen (14) days before your anticipated last date of employment. You also agree during the eighteen (18) months after your employment ends to provide your EMPLOYER with fourteen (14) days' written notice of any new employment or any change in position with a COMPETITOR before assuming the new role to allow for the opportunity to obtain written assurances satisfactory to the COMPANY from you and from the COMPETITOR that you will not be rendering services which conflict with the obligations in this AGREEMENT. The written assurances shall contain the specific detail set out in Section 3.3 above.

Op-Co Headquarters
Positions – January 2017

3.5   If your employment within the COMPANY terminates for reasons other than misconduct, then you may be entitled to certain payments if you satisfy the requirements and procedures in Addendum A to this AGREEMENT.  If you voluntarily terminate or resign from your employment, then you will not be eligible to receive these payments.

3.6   For purposes of this AGREEMENT, "COMPETITOR" means any person or entity including, but not limited to, you or anyone acting on your behalf, that is engaged or preparing to be engaged in research, development, production, manufacturing, marketing or selling of, or consulting on, any product, process, technology, machine, invention or service in existence or under development that resembles, competes with, may now or in the future compete with, can be substituted for or can be marketed as a substitute for  any product, process, technology, machine, invention, or service of any COMPANY that is in existence or that is, was, or is planned to be under development.   "DIVERSIFIED BUSINESS" means that the COMPETITOR has distinct and separate lines of business which do not compete with any EMPLOYER for whom you have worked in the last two (2) years of your employment within the COMPANY.

## 4.   Non-Solicitation of Customers and Employees

4.1   During your employment within the COMPANY and for a period of eighteen (18) months after the termination of your employment (whether voluntary or involuntary), you agree that you will not, directly or indirectly, contact, call upon, solicit business from, sell to, render services to, and/or market services or products to any CUSTOMER.  You also agree you will not assist any person or entity in taking any of these actions.  The restrictions of this Section 4.1 will not apply with respect to services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

4.2   During your employment with any COMPANY and for a period of twelve (12) months after the termination of your employment (whether voluntary or involuntary), you agree that you will not directly or indirectly, on your own behalf or in combination with any other person or entity, engage in any activity which involves the solicitation or hiring of any individual then employed by any COMPANY with whom you have worked or who became known to you as a result of your employment within the COMPANY to leave his or her employment within the COMPANY.  The non-hire restrictions of this Section 4.2 will not apply with respect to services you render in California after termination of your employment.

4.3   For purposes of this AGREEMENT, "CUSTOMER" means any entity, client, account or person, including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts or persons, that you contacted, solicited any business from, sold to, rendered any service to, were assigned to, had management responsibilities for, received commissions or any compensation on, or promoted or marketed any products or services to, during the last twelve (12) months of your employment within the COMPANY.

## 5.   Breach of the Agreement and Remedies

Op-Co Headquarters
Positions – January 2017

5.1   You agree and acknowledge that your breach of the covenants contained in this AGREEMENT will cause irreparable harm to the COMPANY and that damages arising out of a breach may be difficult to determine. You therefore agree and acknowledge that, in addition to all other remedies provided at law or in equity, the COMPANY shall be entitled to specific performance and temporary and/or permanent injunctive relief, from any court of competent jurisdiction restraining the breach or further breaches by you, your new employer and others acting in concert with you, without the necessity of the COMPANY proving actual damages or posting of a bond.  The Court shall have the power to enforce any period of restriction from the date of the last breach up to a maximum of thirty-six (36) months.  In addition, if the COMPANY prevails in any suit under this AGREEMENT, in whole or in part, after having provided you an opportunity to cure the potential breach through expedited mediation before you commence employment in a position that may conflict with your obligations under this AGREEMENT, then you shall also be liable for the COMPANY's costs and attorney's fees in connection with the lawsuit and any related legal proceedings.

## 6.   General Provisions

6.1   This AGREEMENT will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules.  Any action relating to or arising out of this AGREEMENT may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both such courts and to service of process by United States mail or express courier service in any such action.  For employees who primarily live and work in California, this Section 6.1 shall not apply.

6.2   In the event any provision of this AGREEMENT is invalidated or not enforced under applicable law, this shall not affect the validity or enforceability of the remaining provisions of this AGREEMENT.  To the extent any provision of this AGREEMENT is unenforceable because it is deemed overbroad, the provision shall be applied and enforced in a more limited manner to the fullest extent permissible under the applicable law.

6.3   You acknowledge that your EMPLOYER is one of numerous entities within the Johnson & Johnson Family of Companies that have, or will have as the result of any future acquisition, merger, assignment or otherwise, an interest in your employment, and that each COMPANY is an express third-party beneficiary of this AGREEMENT.

6.4   You agree that any COMPANY may transfer, convey or assign this AGREEMENT and any of the COMPANY's rights or obligations, in whole or in part, to any existing or future affiliate of the COMPANY or to any third party, including in connection with any merger, sale of assets, sale of stock or any other form of acquisition or transaction that pertains to all or part of the business of any COMPANY, and you consent to any such transfer, conveyance or assignment.

6.5   No modification of or amendment to this AGREEMENT will be effective unless it is in writing and signed by you and by an authorized representative of your EMPLOYER.  You represent that you have not relied on any oral, written or other representation by any representative of the COMPANY concerning the subject matter of this AGREEMENT that is not expressly stated in this AGREEMENT and that the terms of this AGREEMENT, together with Addendum A, are fully stated herein.

Op-Co Headquarters
                                              Positions – January 2017

6.6   All previous non-competition, non-solicitation, confidentiality, non-disclosure and/or intellectual property agreements between you and the COMPANY shall remain in effect to the extent applicable therein. In the event that this AGREEMENT is declared invalid, void, overbroad or unenforceable, in whole or in part, for any reason, then you understand, agree and acknowledge that any such previous agreements between you and the COMPANY may be enforced as applicable therein.

6.7   Nothing contained in this AGREEMENT shall be deemed to confer on you any rights with respect to the duration of your employment. YOUR EMPLOYMENT IS TERMINABLE AT WILL BY EITHER YOUR EMPLOYER OR YOU, WITH OR WITHOUT CAUSE, EXCEPT THAT IF YOU INITIATE THE TERMINATION, THERE SHALL BE, AT YOUR EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER YOU GIVE WRITTEN NOTICE OF TERMINATION BEFORE IT BECOMES EFFECTIVE, during which you will provide such transitional services as your EMPLOYER may request and your EMPLOYER will continue your pay.

YOU ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, AND YOU AGREE TO THE TERMS ABOVE AND ACKNOWLEDGE THAT YOU INTEND TO BE LEGALLY BOUND BY THIS AGREEMENT.

DATE: Jun 6, 2017 _____

*Brandon Randall*
Brandon Randall (Jun 6, 2017)
_____
EMPLOYEE SIGNATURE

Brandon Randall
_____
Employee Name (Please Print)

187 Tobey Garden St.
_____
Address

Duxbury, MA
_____
City/State

Op-Co Headquarters
Positions – January 2017

**ADDENDUM A**

A.    If, after at least a month following the termination of your employment within the COMPANY, for reasons other than misconduct or your voluntary resignation, and after a diligent search for employment that complies with the terms of the AGREEMENT, you are unable to obtain employment in a position in which your annual base salary is at least equal to your annual base salary at the time of such termination solely because of the restrictions set forth in Sections 3.2 and/or 3.3 of this AGREEMENT, then, commencing after submission of an application for payment and any additional requested information and documents and a determination by your EMPLOYER in due course that you qualify for payment, your EMPLOYER shall make monthly payment to you equal to the lesser of (i) the amount you last received each month from your EMPLOYER pursuant to an annual base salary or (ii) the difference between your last annual base salary at your EMPLOYER and your annual base salary (per month) in any subsequent position for each month for which you properly apply for payment and your EMPLOYER determines your entitlement.  Your annual base salary for or with any subsequent employer will be based on your EMPLOYER's reasonable projection of the amounts to be received by you during the first twelve (12) months in that employment.  No payment shall be made in advance of the month for which it is requested.

B.    To be considered for the payments provided for in Paragraph A above for each month that you claim payment is due, you must establish and represent in writing to the highest-ranking employee in the Human Resources organization of your EMPLOYER, within fifteen (15) days following the end of each month that you are seeking payment, that although you diligently sought work in the prior month consistent with your obligations under Sections 3.2 and/or 3.3 of the AGREEMENT, you were unable to attain employment from a new employer in a position in which your annual base salary equaled the annual base salary you last received from your EMPLOYER, solely because of a restriction set forth in Sections 3.2 and/or 3.3 of the AGREEMENT.  You must also submit a completed Application for Payment Pursuant to Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement and promptly provide such further information or documents concerning your job search as your EMPLOYER may request to verify the accuracy of your representations.

C.    In the event that you are offered a position which you believe conflicts with your obligations under either Section 3.2 or 3.3 of the AGREEMENT, you must inform your EMPLOYER so that your EMPLOYER may evaluate the position and consider whether the position may be allowable under the terms of this AGREEMENT or permissible with appropriate restrictions.  No payment shall be due under Paragraph A if you fail to make timely application for or to provide on a timely basis any information or documents requested by your EMPLOYER or required under this Addendum or if you provide incomplete or inaccurate information regarding your job search.

D.    If your EMPLOYER determines that you are entitled to payment under Paragraph A, your EMPLOYER may elect in its sole discretion, in lieu of payment, to provide you a written release from all or part of the restrictions of Sections 3.2 or 3.3 of the AGREEMENT.  In the event your EMPLOYER elects to provide such written release, EMPLOYER will no longer be obligated to make any payments contemplated by Paragraph A above.

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Ethicon, Inc. and Medical Device Business Services, Inc.

## DEFENDANTS

Brandon Randall

**(b)** County of Residence of First Listed Plaintiff   Somerset County, NJ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Stephen M. Orlofsky, Blank Rome LLP
300 Carnegie Center, Suite 220 Princeton, NJ 08540
(609) 750-7700

Attorneys *(If Known)*
Clarence Wilbon, Adams and Reese LLP
6075 Poplar Ave., Suite 700
(901) 524-5324

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
    Plaintiff

☐ 3  Federal Question
    *(U.S. Government Not a Party)*

☐ 2  U.S. Government
    Defendant

☒ 4  Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☒ 190 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
    Proceeding

☐ 2  Removed from
    State Court

☐ 3  Remanded from
    Appellate Court

☐ 4  Reinstated or
    Reopened

☐ 5  Transferred from
    Another District
    *(specify)*

☐ 6  Multidistrict
    Litigation -
    Transfer

☐ 8  Multidistrict
    Litigation -
    Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332
Brief description of cause:
Breach of Contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
    UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**     ☐ Yes    ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE
09/29/2020

SIGNATURE OF ATTORNEY OF RECORD
/s/ Stephen M. Orlofsky

**FOR OFFICE USE ONLY**

RECEIPT #                AMOUNT                APPLYING IFP                JUDGE                MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdiction be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
   United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
   United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
   Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
   Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.**  (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**    **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**    **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin.**  Place an "X" in one of the seven boxes.
   Original Proceedings.  (1) Cases which originate in the United States district courts.
   Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.
   Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
   Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
   Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
   Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
   Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
   **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**    **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**    **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
   Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
   Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.